**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CYNTHIA BINGHAM, both individually | : | |
| and as the Administratrix of the ESTATE | : | |
| OF JUSTIN T. AICHHOLZ, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | DOCKET NO. 2:22-cv-02769 |
| LANCASTER COUNTY, SERGEANT | : | |
| PHILIP KLINGER, CORRECTIONAL | : | |
| OFFICER MARCUS JONES, | : | |
| CORRECTIONAL OFFICER RANDALL | : | |
| SNODDERLY, CORRECTIONAL | : | |
| OFFICER NICHOLAS CARPINELLI, | : | |
| CORRECTIONAL OFFICER JEFFREY | : | |
| CHRISTNER, CORRECTIONAL | : | |
| OFFICER JOHN/JANE DOES (1-10), | : | |
| PRIMECARE MEDICAL, INC., | : | |
| WILLIAM CATTELL, MD, JESSICA | : | |
| GRIMM, LSW, and CASSANDRA | : | |
| BIRRIEL, | : | |
| | : | |
| Defendants. | : | |

**BRIEF IN SUPPORT OF DEFENDANTS, LANCASTER COUNTY, SERGEANT PHILIP KLINGER, CORRECTIONAL OFFICER ("CO") MARCUS JONES, AND CO RANDALL SNODDERLY'S MOTION FOR SUMMARY JUDGMENT[1]**

Pursuant to Federal Rule of Civil Procedure 56, Defendants, Lancaster County, Sergeant (Sgt.) Philip Klinger, CO Marcus Jones, and CO Randall Snodderly, (collectively "Lancaster Defendants"), by and through their attorneys, MacMain Leinhauser PC, respectfully submit this Brief in Support of their Motion for Summary Judgment seeking dismissal of all claims alleged against the Lancaster Defendants in Plaintiffs' Amended Complaint (ECF 38).

---

[1] Plaintiff has agreed to voluntarily dismiss COs Jeffrey Christner and Nicholas Carpinelli. A stipulation of dismissal will be filed once executed by the parties .

# Table of Contents

I.      Introduction……………………………………………………………………………6

II.     Procedural History…………………………………………………………………...8

III.    Statement of Undisputed Material Facts…………………………………………….9

IV.     Statement of Questions Presented……………………………………………………9

V.      Standard of Review……………………………………………………………….......10

VI.     Argument……………………………………………………………………….......11

        A.      Plaintiffs' Claim of Deliberate Indifference Fails……………………………11

                1.      Decedent Did Not Have A "Particular Vulnerability To Suicide"………13

                2.      The Lancaster Defendants Did Not Know Of Any Alleged Vulnerability To Suicide………………………………………………………………..17

                3.      The Lancaster Defendants Did Not Act With Deliberate Indifference………………………………………………………………18

        B.      The Individual Defendants are Entitled to Qualified Immunity…………………19

        C.      Plaintiffs' *Monell* Claims Fail as a Matter of Law………………………………22

                1.      No Deliberate Indifference/Right Deprivation -  No *Monell*……………23

                2.      The Policies and Procedures of Lancaster County Prison were Not Deficient……………………………………………………………………24

                3.      Plaintiffs Fail to Establish that Lancaster County Prison's Training was Inadequate…………………………………………………………………25

        D.      Plaintiffs' Wrongful Death and Survival Claims Fail…………………………26

        E.      Plaintiffs' Claim for Punitive Damages Fail………………………………………28

VII.    Conclusion……………………………………………………………………………28

Certificate of Service……………………………………………………………………30

## **Table of Authorities**

*Cases*

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)……………………………………………20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)………………………………..10

*Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011)…………………………………………20, 22

*Ball v. Bower,* 2013 U.S. Dist. Lexis 167289, at *17-*18 (M.D. Pa. Aug. 29, 2013) (Carlson, M.J.)………………………………………………………………………………………...11

*Becker v. Carbon Cty.*, 177 F. Supp. 3d 841, 847 (M.D. Pa. 2016)……………………………..28

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403-04 (1997)…………………23

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001)…………………………………12

*Blackhawk v. Pennsylvania*, 381 F.3d 202, 215 (3d. Cir. 2004)……………………………21

*Bland v. City of Newark*, 900 F3d 77, 87 (3d Cir. 2018)…………………………………...22

*Bornstad v. Honey Brook Twp.,* 2004 U.S. Dist. LEXIS 9690 at *14 (E.D. Pa. 2004)………….27

*Brennan v. Norton*, 350 F.3d 399, 428-29 (3d Cir. 2003)………………………………….28

*Bright v. Westmoreland Cty.*, 380 F.3d 729, 741 (3d Cir. 2004)……………………………27, 28

*Burkhart v. Knepper,* 310 F. Supp. 2d 734, 742-44 (W.D. Pa. 2004)…………………………...27

*Carswell v. Borough of Homestead*, 381 F.3d 235, 245 (3d Cir. 2004)………………………24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………………………10, 11

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986)………………………………………23, 24

*City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) (per curiam)…………………………………21

*Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991)………………12, 13, 17

*Curly v. Klem*, 298 F.3d 271 (3d Cir. 2002)………………………………………………..20

*District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)…………………………………21, 22

*El v. City of Pittsburgh,* 975 F.3d 327 (3d Cir. 2020)…………………………………………11

*Francis v. Northumberland County*, 636 F.Supp.2d 368 (M.D. Pa., July 7, 2009)……………...27

*Freedman v. City of Allentown,* 853 F.2d 1111, 1115 (3d Cir. 1988)…………………….....13

*Fry v. Smoker et.,al.* 2012 U.S. Dist. LEXIS 64939, *8 (E.D. Pa., May 9, 2012)………………23

*Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (4th Cir. 1996), *cert. denied*, *Riccardi v. Grant*, 532 U.S. 919 (2001)……………………………………………………………...10, 19, 20

*Heckenswiler v. McLaughlin,* 2008 U.S. Dist. LEXIS 76771 (E.D. Pa., Sep. 29, 2008)………..27

*Herman v. County of York,* 482 F.Supp. 2d 554, 565 (M.D. Pa. 2007)…………………………16

*Hernandez v. Borough of Palisades Park Police Dep't.*, 58 F. App'x 909, 912 (3rd Cir. 2003)..10

*In re Gibbons*, 2020 U.S. App. LEXIS 12707 at *8 (3d Cir. April. 21, 2020)………………21, 22

*Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 931 (E.D. of Wis. 1999)…………………...24

*Monell v. Dep't. of Social Servs. of N.Y,* 436 U.S. 658 (1978)………………………22, 23, 24, 26

*Mullenix v. Luna*, 577 U. S. 7, 12 (2015) (per curiam)…………………………………………...21

*Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017)…………………………………………12

*Puza v. Carbon County (In re Estate of Stephen Puza)*, 586 F.Supp.2d 271 (M.D. Pa., September 26, 2007)……………………………………………………………………………27

*Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam)…………………………………21

*Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)……………………………………………19, 20

*Schuenemann v. United States,* 2006 U.S. App. LEXIS 4350 at *10 (3d Cir. Feb. 23, 2006)…..16

*Simmons v. Simpson House, Inc.*, 259 F. Supp. 3d 200, 209 (E.D. Pa. 2017)…………………...27

*Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001)…………………………11

*Scott v. Harris*, 550 U.S. 372, 380, (2007)……………………………………………………11

*Serafin v. City of Johnstown*, 53 Fed. Appx. 211, 213-14 (3d Cir. 2002)………………………12

*Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015)…………………………22

*Startzell v. City of Philadelphia*, 2007 U.S. Dist. LEXIS 4082, at *75 (E.D. Pa., January 18, 2007)(Stengel, J.)……………………………………………………………………...28

*Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992)…………………………………24

*Wargo v. Schuylkill County,* 2008 U.S. Dist. LEXIS 92866 at *14 (M.D. Pa. 2008)…...13, 16, 17

*White v. Pauly*, 137 S. Ct. 548, 551 (2017)……………………………………………………19, 20

*Williams v. Musser*, 1997 WL 403509, at *10 (N.D. of I11. 1997)……………………………...24

*Williams v. West Chester*, 891 F.2d 458, 467 (3d Cir. 1989)……………………………………23

*Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d. Cir. 2005)………………………12, 13

**Statutes**

42 U.S.C. § 1983…………………………………………………………………………20, 22, 23

42 Pa. C.S.A. § 8501……………………………………………………………………………26

42 Pa. C.S.A. § 8541, *et seq*……………………………………………………………………26

42 Pa. C.S.A. § 8541……………………………………………………………………………26

42 Pa. C.S.A. § 8542(a)…………………………………………………………………………26

42 Pa. C.S.A. § 8542(b)…………………………………………………………………………27

42 Pa. C.S.A. §8545…………………………………………………………………………...27

**Rules**

Fed. R. Civ. P. 56……………………………………………………………………………...28

Fed. R. Civ. P. 56(c)………………………………………………………………………10, 11

I.    <u>**INTRODUCTION**</u>

Plaintiffs' son, Justin Aichholz ("Mr. Aichholz", "Plaintiff" of "Decedent") was admitted to Lancaster County Prison ("LCP") on July 11, 2020.  At the time of his booking, Aichholz was screened by LCP staff for his suicide risk, and again by PrimeCare Medical.  Mr. Aichholz was classified by PrimeCare medical staff as a suicide risk during intake and placed on Level I Suicide Status ("SSI") status.  Two (2) days later, on July 13, 2020, Aichholz was downgraded by PrimeCare personnel from "SSI" to Suicide Status Level II ("SSII") which is less restrictive than "SSI."  PrimeCare Medical personnel make all such decisions about levels of suicide, downgrading levels, and removing persons from any form of suicide watch.

Four (4) days later, on July 17, 2020, Mr. Aichholz was removed by PrimeCare medical staff from "SSII" and placed on Psychiatric Observation III ("POIII" or "Psych Ob").  **POIII is not a suicide level as the medical professionals determined that Mr. Aichholz was no longer a suicide risk.**  As will no doubt be described in more detail in PrimeCare's filing, this medical determination was made based on a number of things including that Mr. Aichholz stated that he was feeling much better and had no thoughts of harming himself. He also confessed that his prior claims of suicide were a lie, and he was just trying to avoid being caught with the drugs that he had secreted on his person when he was arrested, and hoped that he would be taken to a hospital and not prison where his chances of not having the hidden drugs found were far better.

When an inmate is placed on POIII by PrimeCare, he is returned to a 'regular cell' and given back all of the normal belongings.  POIII requires that checks be made every 30 minutes— which importantly, were completed in this incident. In fact, the last check was done at 8:06 p.m.

- approximately ten (10) minutes before Mr. Aichholz was found hanging in his cell and CO Jones saw that Aichholz sitting on his bed in no apparent distress.[2]

CO Carpinelli, who did a block check around 4:34 p.m. and spoke to Aichholz around 5:09 p.m. (3 hours before Aichholz took his life), said that Aichholz was in an upbeat mood after his removal from suicide precautions and placement in a 'regular' cell wherein he was given back all of his personal effects.

Aichholz was also seen at 4:32 p.m. by PrimeCare Medical personnel for a detox check and reported no thoughts of self-harm or risk of self-harm.

Video reflects Aichholz taking his dinner tray, and returning the same to the hallway outside of his cell around 5:41 p.m. – 5:52 p.m.  *See* Exhibits "A"  between 5:41 p.m. – 5:52 p.m. and Exhibit "C" at JA000046. He is thereafter seen on video moving about in his cell and at his cell door at 6:50 p.m. to 6:59 p.m.  *See.*  Exhibit "A" between 6:50 p.m. to 6:59 p.m.  and Exhibit "C" at JA000047.

Checks of Aichholz by LCP Correctional Staff are observed being performed—on video—at 7:05 p.m., 7:32 p.m., and 8:06 p.m.  *See* Exhibit "A" at 7:05 p.m., 7:32 p.m., and 8:06 p.m., and Exhibit "C" at JA000047.

At almost 8:17 p.m**.**, the video shows CO Christner and PrimeCare Nurse Otero passing out the evening's medications when they pass Aichholz' cell and CO Christener does a double-take, and re-looks to find Aichholz hanging in the corner of his cell where there an area of privacy where the toilet and sink are located .  A Code Blue was called with both LCP and PrimeCare personnel, and shortly thereafter, EMS personnel, responding to render medical aid.

---

[2] As noted in Defendants' Statement of Facts, the act of taking one's life by hanging occurs, in effect, in a little over 4 minutes. *See*, Expert report of Andrew Baker, M.D., attached to the Joint Appendix as Exhibit "S".

While EMS was able to get a pulse on Mr. Aichholz, unfortunately he never regained consciousness and succumbed to his injuries at the hospital the following day.

A subsequent investigation by Lancaster *City* Police found no evidence of foul play and the internal investigation by LCP found no evidence of policy violations. Further, the investigation revealed that Aichholz had spoken by phone several times in the preceding days to his mother (Plaintiff), father, girlfriend and an unidentified friend and did not express any threats of suicide, nor did any of them contact LCP to express concern that Aichholz was a self-harm or suicide risk. The investigation also included an interview with another inmate who befriended Aichholz who said Aichholz seemed "happy", he saw no signs that Aichholz was upset or suicidal, and he was "shocked" when he learned that Aichholz had taken his life.

In short, and as more fully set forth herein, none of the three (3) elements necessary to sustain a claim against the Lancaster Defendants can be met – (1) Aichholz did not manifest any suicidal ideation; (2) LCP staff – like the PrimeCare medical staff that deemed him as not a suicide risk; his family and friends; and his fellow inmate friend – had no notice whatsoever that Aichholz was going to take his life; and (3) LCP, with no notice of a suicide risk, were not and could not, be 'deliberately indifferent' to Aichholz' *unknown* suicide plan – be it a long-standing plan that he hid from everyone, or a spontaneous decision.

## II.    **PROCEDURAL HISTORY**

Plaintiff filed the Complaint in this matter on July 17, 2022.  ECF 2.  Plaintiff then filed an Amended Complaint on March 20, 2023, to which Lancaster Defendants filed an Answer with Affirmative Defenses on March 27, 2023. ECF 38 and 39.  The parties then engaged in discovery and following several extensions thereof, discovery closed on October 3, 2023.

### III.    <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

A separate Statement of Undisputed Material Facts, with a Joint Appendix containing Exhibits "A" through "U," JA000001-002555, for which Defendants contends there are no genuine issue to be tried, is being filed contemporaneously with Defendants' Motion and Brief in Support and are incorporated herein by reference.

### IV.    <u>STATEMENT OF QUESTIONS PRESENTED</u>

A.    Does Plaintiffs' claim for deliberate indifference to Justin Aichholz' medical needs fail because the record reflects that Mr. Aichholz (1) did not have a suicidal ideation; (2) LCP had no notice of Aichholz' suicidal thoughts; (3) were not 'deliberately indifferent' to Aichholz as he received continuous treatment from PrimeCare, and the Lancaster County Prison Staff did not interfere with the treatment Mr. Aichholz received?

*Suggested answer: Yes.*

B.    Are the individual Lancaster Defendants entitled to Qualified Immunity?

*Suggested answer: Yes.*

C.    Does Plaintiff's *Monell* claim fail because the there is no underlying violation to support the claim and Lancaster County Prison had the appropriate policies, procedures and training were in place?

*Suggested answer: Yes.*

D.    Does Plaintiffs' Wrongful Death and Survival Action fail as a matter of law pursuant to the Pennsylvania Tort Claims Act and because the underlying claims fail?

*Suggested answer: Yes.*

E.    Does Plaintiffs' claim for punitive damages fail because none of the individually named Lancaster Defendants acted callously or recklessly disregarded Mr. Aichholz's rights?

*Suggested answer: Yes.*

## V.    <u>STANDARD OF REVIEW</u>

Summary judgment should be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists when the evidence requires a fact finder to resolve the parties' differing versions of the truth at trial. *Id.* at 249. Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original).

The standard for ruling on a motion for summary judgment as articulated by the Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) is as follows:

> [T]he plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.

*Id.*  "[I]t is proper for a district court to grant summary judgment when a plaintiff fails to produce any evidence on a necessary element of her claim." *Hernandez v. Borough of Palisades Park Police Dep't.*, 58 F. App'x 909, 912 (3rd Cir. 2003) (citing *Celotex*, 477 U.S. at 323-25).  The plaintiff "need not try . . . [his] case by carrying the burden of persuasion, but []he must, at a minimum, produce evidence on every element of . . . [his] claim." *Hernandez*, 58 F. App'x at 912. Thus, the burden on the party moving for summary judgment is not to show the "absence of a genuine issue of material fact," but rather to show "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.

Moreover, "in order to survive a summary judgment motion in which the movant argues that there is an absence to support her case, the plaintiff must point to some evidence beyond her raw claim. . . ." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986)).  Further, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . ." *Scott v. Harris*, 550 U.S. 372, 380, (2007) (citation omitted).  The Court in *Scott* provided "[w]hen opposing parties tell two different stories, one of which is *blatantly contradicted by the record*, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.* (emphasis added).

Finally, as noted by the United States Supreme Court in *Scott*, this Honorable Court must view the facts in the light depicted by the videotape, not the "visible fiction" that is contained in Plaintiff's Complaint. *Id.* at 382.  *See also, El v. City of Pittsburgh,* 975 F.3d 327 (3d Cir. 2020) (noting that appellate court must accept finding of facts by lower court unless blatantly contradicted by the video); *Ball v. Bower,* 2013 U.S. Dist. Lexis 167289, at *17-*18 (M.D. Pa. Aug. 29, 2013) (Carlson, M.J.) ("where critical events at issue have been captured on videotape, the Court is obliged to consider the videotaped evidence in determining whether there is any genuine dispute as to material facts.").

## VI.    ARGUMENT

### A.    Plaintiffs' Claim of Deliberate Indifference Fails

In order for Plaintiffs to establish her claim for deliberate indifference to Decedent's medical needs or "vulnerability to suicide," Plaintiff bears the burden of establishing three elements:

11

(1) The detainee had a "particular vulnerability to suicide,"

(2) The custodial officer or officers knew [...] of that vulnerability, and

(3) Those officers "acted with reckless indifference" to the detainee's particular vulnerability.

*Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d. Cir. 2005) (*quoting Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991)). Regarding the second element, an official's knowledge of an inmate's "vulnerability to suicide", the Third Circuit has stated that:

> [a]lthough we have held in the past that this obligation devolves on prison officials if they know or objectively should know that an inmate is particularly vulnerable to suicide, we have since adopted a subjective test for Eighth Amendment deliberate indifference claims in prison conditions cases[]. **Consequently, in determining whether a prison official has shown deliberate indifference to inmate health or safety, we look to what a prison official actually knew** rather than to what a reasonable official in his or her position should have known.

*Serafin v. City of Johnstown*, 53 Fed. Appx. 211, 213-14 (3d Cir. 2002) (internal citations omitted) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001)) (emphasis added).

For liability to attach, "there must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017) (quoting *Colburn*, 946 F.2d at 1024). Furthermore, "[e]ven where a strong likelihood of suicide exists, it must be shown that the custodial officials 'knew or should have known' of that strong likelihood." *Colburn*, 946 F.2d at 1024. Moreover, "there can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Id.,* at 1025.

Further elaborating on this standard, the Third Circuit has instructed that

> [t]he strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action

> […] the risk of self-inflicted injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

*Id.* This burden for proving liability in a prison suicide case "is a difficult one to meet," *Wargo v.*

*Schuylkill County,* 2008 U.S. Dist. LEXIS 92866 at \*14 (M.D. Pa. 2008), because

> A prison custodian is not the guarantor of a prisoner's safety. We cannot infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect the safety of prisoners entrusted to their care.

*Freedman v. City of Allentown,* 853 F.2d 1111, 1115 (3d Cir. 1988).

Here, Plaintiff has failed to produce evidence to support any of the three requisite elements of deliberate indifference to a known risk of suicide claim. Accordingly, Plaintiff's claims fail.

### 1.   *Decedent Did Not Have a "Particular Vulnerability To Suicide"*

Plaintiff must first prove that Decedent had a "particular vulnerability to suicide" meaning "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Woloszyn*, 396 F.3d at 320 (quoting *Colburn*, 946 F.2d at 1023)(emphasis added). In Decedent's case, neither of these conditions were met.

Mr. Aichholz was assessed for risk of suicide upon entry to LCP by medical professionals from PrimeCare and placed on SSI when he was admitted to LCP on July 11, 2020. Mr. Aichholz remained on SSI for two days and was continually monitored and assessed by medical professionals from PrimeCare.  On July 13, 2020, Mr. Aichholz denied suicide ideation and any mental health concerns/complaints, so he was placed on SSII by Jessica Grimm, LSW of

PrimeCare.  Mr. Aichholz remained on SSII for the next three (3) days and was monitored and assessed by medical professionals from PrimeCare.

On July 17, 2020, Aichholz was seen Jessica Grimm, LSW of PrimeCare medical, who in her professional opinion, determined that Aichholz was no longer suicidal and placed Mr. Aichholz on Level III Psychiatric Observation III ("POIII").  At that time, Aichholz denied any mental health concerns/complaints, rated himself as a six (6) or seven (7) out of ten (10), was rated as a low risk of harm to himself and others—his condition was good and significantly improved since her last meeting with him.  He was also seen at 4:37 p.m. for a detox check by a PrimeCare medical professional and denied any thoughts of self-harm.

It is clear that the PrimeCare medical and mental health personnel – the professionals who were most qualified to recognize if Mr. Aichholz had suicidal ideation – did not believe that he was a suicide risk as of July 17, 2020. To the contrary, LSW Grimm saw and removed Mr. Aichholz from SSII status.  As such, and as a matter of law, it cannot be proven that LCP correctional staff should have detected that Aichholz had a particular vulnerability to suicide if medical personnel did not detect same.

LSW Grimm was not alone in not detecting any self-harm concerns.

CO Carpinelli saw Aichholz at 4:30 p.m. and 5:00 p.m. - just 3 hours before Aichholz suddenly and unexpectedly took his life - and described Aichholz as "upbeat" and "happy" for being removed from suicide status and getting all of his belongings back. *See* Exhibit "N" containing the deposition transcript of CO Carpinelli at JA001792-93, 65:19-66:2. *See* Exhibit "C" containing Lancaster County Prison Incident/Investigation Report of Charles Stevens at JA000046-47, Lancaster 00122-123. None of the other COs who interacted with or did block checks of Aichholz cell – COs Snodderly or Jones – detected any self-harm or suicidal concerns.

14

None of the other inmates detected or raised any concerns to LCP staff that Mr. Aichholz was depressed or a self-harm risk. Indeed, one inmate who got to know Aichholz and shared a commissary account with him - Jason Roy Velaquez - was "shocked" when he heard the code blue called for Aichholz. He said that "Jimmy Neutron" (the nickname he gave Aichholz) was "happy" and showed no signs that he would hurt himself. *See* Exhibit "C" at JA000048, *see also* Exhibit "T" Interview with Jason Velaquez at JA002551.

Likewise, those people who knew him best - Aichholz' mother (plaintiff), father, long-time girlfriend and another unidentified friend - all spoke to him by phone during the several days before he took his life, and none detected any concerns. *See* Exhibit "C" at JA000298. Specifically, during the subsequent LCP investigation, the prison investigator listened to phone calls that Mr. Aichholz made to those that knew him far better than the COs or the PrimeCare Medical professionals and none of these individuals ever called LCP to express a concern that in their view, Aichholz said something or gave them the indication that he was going to harm himself [3].   *See* Exhibit "G" containing the deposition transcript of Gary Aichholz at JA000265-268, and JA000272-274, and 63:11- 66:18 and 70:15-72:7.  (stating that although Mr. Aichholz seemed hurt, he did not appear suicidal to his father—who would have called LCP if he suspected that his son would take his own life); *see also* Exhibit "H" containing the deposition transcript of Cynthia Bingham at JA000413, 60:1:63:9 (stating that when she spoke with Mr. Aichholz in LCP she was not concerned that he would harm himself because Mr. Aichholz was in "better spirit").

---

[3] These personal calls are not monitored by LCP. *See* D.T. of Warden Cheryl Steberger (Ex. "U") at JA002649-002650.

"Courts have found a lack of a particular vulnerability to suicide in cases where . . . family members report that they did not suspect such activity would occur." *Wargo,* 2008 U.S. Dist. LEXIS 92866 at *18-19 (citing *Herman v. County of York,* 482 F.Supp. 2d 554, 565 (M.D. Pa. 2007) (finding that "in the face of [decedent's] repeated denials of suicidal ideation and, indeed, his own family's testimony that they did not suspect that he was suicidal…we see no reason that their decision not to place [decedent] on suicide watch would fall outside of their professional judgment.") and *Schuenemann v. United States,* 2006 U.S. App. LEXIS 4350 at *10 (3d Cir. Feb. 23, 2006) (finding no particular vulnerability to suicide when "ten witnesses, including [decedent's] close family members, observed him…[over a period of days and] [n]one of those individuals claims that [decedent] was acting abnormally or that he gave any indication that he was going to inflict harm upon himself."); *Wargo,* 2008 U.S. Dist. LEXIS 92866 at *15 (noting that "people who knew Wargo well and spoke with him while he was incarcerated reported that they did not consider him likely to harm himself") and **18, 30-31 (finding no particular vulnerability to suicide where, *inter alia*, none of decedent's family members or friends had seen any reason to suspect that suicide was imminent, and even though during his incarceration decedent had ingested 10-12 Oxycontin tablets, pulled threads from his mattress, and lodged a staple in or near his eye).

While it cannot be denied that Mr. Aichholz did take his own life while incarcerated at LCP, it is also clear that he did not exhibit any signs of suicidal ideation that would have alerted LCP staff that he may have been a danger to himself. Indeed, as a matter of law and as discussed above, if independent mental health professionals considered him not likely to harm himself and saw no signs of impending suicidal intentions it cannot be said that LCP correctional officers should have known. Likewise, as a matter of law and as discussed above, if his family members

who knew Aichholz better than either the medical professionals or the LCP correctional officers, and who spoke to Aichholz on the phone multiple times during his incarceration, did not detect any concerns that Aichholz was going to harm himself – or alert LCP of concerns –it cannot said that LCP correctional officers should have known.  Further, if other inmates – including Inmate Velazquez who had befriended Aichholz and described him as "happy"  was 'shocked' to learn of his suicide and saw no signs - how can it be said that LCP correctional officers should have known?

In short there is absolutely no evidence that the LCP Defendants - like the various medical professionals, Aichholz' mother, Aichholz' father, Aichholz' long-time girlfriend, his fellow inmates including his friend Inmate Velazquez - knew or should have known of Aichholz' suicidal ideation. Rather, it is clear that Aichholz kept his intention to take his life hidden from everyone, and it would be contrary to the law and fairness to hold the LCP Defendants liable for something no one else detected.

### 2. *The Lancaster Defendants Did Not Know Of Any Alleged Vulnerability To Suicide*

Plaintiffs are also unable to show the second requisite element – that any of the Lancaster Defendants knew of any vulnerability to suicide.

> To establish that the defendants knew or should have known of [decedent's] particular vulnerability, [a] plaintiff must advance evidence that "[t]he 'strong likelihood' of suicide [was] 'so obvious that a lay person would easily recognize the necessity for' preventative action [and] the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

*Wargo v. Schuylkill County*, 2008 U.S. Dist. LEXIS 92866 at *21 (quoting *Colburn*, 946 F.2d at 1025).

As discussed above, trained mental health workers did not believe Mr. Aichholz was a suicide risk as of July 17, 2020 when he was lowered to POIII, and certainly did not think Mr. Aichholz was a suicide risk during that afternoon and early evening. If the trained mental health personnel felt that Mr. Aichholz was not a suicide risk, then it simply cannot be said, based on the record in this case, that the Lancaster Defendants – none of whom are trained medical or mental health providers – were aware that Mr. Aichholz was at risk of committing suicide. Instead, the record indicates that the Lancaster Defendants reasonably relied upon the thorough assessments that were completed by trained mental health professionals and had no reason to believe that Mr. Aichholz was a suicide risk.

Further, as noted above if his parents and his long-time girlfriend, and his fellow inmates saw no signs, then how could it be said that the COs "should have" known?

Moreover, as to the specific COs named as Defendants, at the time of Mr. Aichholz suicide attempt, CO Jones was only on the cell block for a single check as he was helping with a break for the assigned personnel. CO Jones had no prior knowledge of or contact with Aichholz, and, like those that had greater contact with Aichholz, had no knowledge that he had suicidal ideation. *See* Exhibit B at JA000006-7. As to CO Snodderly (and CO Carpinelli, he had no knowledge of any suicidal ideation and was on a break when Mr. Aichholz took his own life. *See* Exhibit B at JA000014-15. Sgt. Klinger was not assigned to G-1, rather he was supervising the shift which included multiple blocks - had no contact with Aichholz – with his only role here being responding when the Code Blue (medical emergency) was called. *See* Exhibit B at JA000004. As such, there is simply nothing in the record to support the finding that any of the correctional staff had knowledge that Decedent was a suicide risk. Accordingly, Plaintiff's failure to prevent Decedent's suicide claim fails as a matter of law.

### 3. *The Lancaster Defendants Did Not Act With Deliberate Indifference*

Even assuming, *arguendo*, that Plaintiff could establish both (1) that Mr. Aichholz had a "particular vulnerability to suicide," and (2) that the Lancaster Defendants knew that Mr. Aichholz would decide to kill himself, there is no evidence to support the third required element that the Lancaster Defendants "acted with reckless indifference" to Mr. Aichholz's particular vulnerability. To the contrary, the facts show that Mr. Aichholz was provided with mental health care throughout his incarceration. *See* Exhibit D at JA000158-161 (containing mental health sick calls). Mr. Aichholz was immediately assessed and placed on SSI upon his incarceration on July 11, 2020. He was seen by Mental Health everyday every day, with the exception of July 12, 2020, and when he was ultimately stepped down to POIII / non-suicide status. In fact, Decedent was assessed by a mental health professional approximately eight (8) hours before his suicide.

There is simply nothing in the record to support the finding that the individually named Lancaster Defendants – Sgt. Klinger, CO Snodderly and CO Jones – had any knowledge that Decedent was a suicide risk. Thus, it simply cannot be said that these individuals acted with a deliberate or reckless indifference to Mr. Aichholz's constitutional rights as they had no knowledge of Mr. Aichholz's risk of suicide in the first place. Accordingly, Plaintiffs' failure to prevent Mr. Aichholz's suicide claim fails as a matter of law.

### B. Lancaster Individual Defendants Are Entitled to Qualified Immunity

Even if the Court finds the issue of whether there was a Constitutional violation too close to call, the individually named Lancaster Defendants are nevertheless entitled to qualified immunity and are, therefore, entitled to judgment in their favor." *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).

The defense of qualified immunity shields government officials from liability whenever "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).  Qualified immunity is a question of law for the Court to decide early in the litigation process. *Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (4th Cir. 1996), *cert. denied*, *Riccardi v. Grant*, 532 U.S. 919 (2001).

In *Curly v. Klem*, 298 F.3d 271 (3d Cir. 2002), decided shortly after the Supreme Court's decision in *Saucier v. Katz*, the Third Circuit discussed the two-step inquiry that courts must undertake in determining whether an official is entitled to qualified immunity. First, the court must decide whether the facts alleged show the official's conduct violated a constitutional right. *Curly v. Klem,* 298 F.3d at 277.  If the facts, when viewed in the light most favorable to the plaintiff, do not show that the official violated a constitutional right, then plaintiff's § 1983 claim must fail. *Id*.

Second, the court must ask whether the right was clearly established at the time they acted. *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011). As the Supreme Court first explained decades ago, the clearly established law must be "particularized" to the facts of the case. *White*, 137 S. Ct. at 552 (*citing Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (*quoting Anderson*, 483 U.S. at 639).

The United States Supreme Court explained that "[t]oday, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White*, 137 S.Ct. at 552. The Supreme Court once again urged District and

Circuit Courts to consider qualified immunity arguments carefully, underscoring the requirement that the clearly established law must be "particularized" to the facts of the case. *Id.*

As the Third Circuit has explained, qualified immunity is a high hurdle for Plaintiff to overcome because it provides "ample protection to all but the plainly incompetent, or those who knowingly violate the law." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 215 (3d. Cir. 2004). If the law did not put the Defendants on notice that their conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *See id.*

Two recent unanimous decisions from the Supreme Court of the United States have clarified what it means for a right to be "clearly established." *See City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) (per curiam); *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam). The Court noted that "[w]e have repeatedly told courts not to define clearly established law at too high a level of generality" and emphasized that "[i]t is not enough that a rule be suggested by then-existing precedent; the "'rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted.""" *Bond*, 142 S. Ct. at 11 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). "This requires a high 'degree of specificity.'" *Wesby*, 138 S. Ct. at 590 (quoting *Mullenix v. Luna*, 577 U. S. 7, 12 (2015) (per curiam)). Such "'specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Rivas-Villegas*, 142 S. Ct. at 8 (quoting *Mullenix*, 577 U. S. at 12).

To overcome qualified immunity, a plaintiff must demonstrate that "every reasonable officer" would understand that what he is doing is unlawful based only on the facts that were knowable to the defendant officer. Indeed, the Supreme Court requires Plaintiff to identify a

case that put the Defendant Officer on notice that his specific conduct was unlawful in order to show a violation of clearly established law. *Id*.; see *In re Gibbons*, 2020 U.S. App. LEXIS 12707 at *8 (3d Cir. April. 21, 2020) (noting that plaintiff bears the burden of "identify[ing] a case where an officer acting under similar circumstances [as the defendant officer] was held to have violated the [constitutional provision at issue].").

In evaluating whether a plaintiff has met this burden, the Court must determine whether a clearly establish right was established by: (1) binding Supreme Court precedent; (2) binding Third Circuit precedent; or (3) a "robust consensus of cases of persuasive authority in the Court of Appeals." *In re Gibbons*, 2020 U.S. App. LEXIS 12707 at *9 (quoting *Bland v. City of Newark*, 900 F3d 77, 87 (3d Cir. 2018)). The facts of the cited precedent must present a sufficiently similar factual scenario to the scenario faced by the defendant officers at the "high 'degree of specificity'" that the Supreme Court precedent requires. Id. at *11 (quoting *Wesby*, 138 S. Ct. at 590); *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Here, Plaintiff has not – and cannot – point to a single case from the E.D. of Pa, Third Circuit or Supreme Court from prior to the date of this incident that is factually similar to the present case that would have placed the Officers on notice that 'it was clear that they should have been aware of an inmate's suicidal ideation when trained medical personal determined that the inmate was not suicidal, his family who spoke to him on phone calls raised no concerns, fellow inmates raised no concerns and there was no other evidence such as comments or threats by the inmate or outward signs of suicide risk.' Indeed, to hold a correctional officer liable for not detecting a risk that no one else saw, would be contrary to clear and controlling law, common sense and fairness. As such, qualified immunity must be granted to the Defendant Officers.

22

**C.    Plaintiffs' *Monell* Claim Fails as a Matter of Law**

A public entity and/or policymaker/official can be held liable only where one of its employees is primarily liable under §1983. *Monell v. Dep't. of Social Servs. of N.Y,* 436 U.S. 658, (1978); *Williams v. West Chester*, 891 F.2d 458, 467 (3d Cir. 1989); *City of Los Angeles v. Heller*, 475 U.S. 796 (1986)*.* A municipality cannot be liable under §1983 under a theory of *respondeat superior*. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those edicts, or acts that may fairly be said to represent official policy, inflicts the injury, that the government as an entity is responsible under §1983. *Monell,* 436 U.S. at 694.

"[I]n order to establish liability under Section 1983 against a local government unit or a supervisory official, a plaintiff must demonstrate: (1) the deprivation of a constitutional right; (2) that the action was taken pursuant to a custom or policy of the local government unit; and (3) that the action was the cause of the deprivation." *Fry v. Smoker et.,al.* 2012 U.S. Dist. LEXIS 64939, *8 (E.D. Pa., May 9, 2012) *citing Monell v. Dep't. of Social Servs. of N.Y.,* 436 U.S. 658, 691, (1978). "Identifying a policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* at *9 *quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403-04 (1997) (internal quotations omitted). "An 'act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.'" *Id.* Furthermore, the Plaintiff must produce evidence that the alleged deliberate conduct was the "moving force" that caused the constitutional injury. *Id.*

### 1.     No Deliberate Indifference/Right Deprivation – No *Monell*

Plaintiffs fail to establish a threshold underlying constitutional violation against the

Lancaster Defendants.  As demonstrated above, Plaintiffs have not established that the Lancaster

Defendants were deliberately indifferent to Mr. Aichholz's medical needs because Mr.

Aichholz's continuously received treatment from PrimeCare and there is no evidence of record

to establish that Lancaster Defendants interfered or prohibited Mr. Aichholz's medical care.

Without a substantive violation, Plaintiffs fail to present a factually plausible *Monell* claim

against Lancaster County.  *See, e.g., Heller*, 475 U.S. at 799.  Therefore, summary judgment

should be entered for Lancaster Defendants.

### 2.     The Policies and Procedures of Lancaster County Prison Were Not Deficient

In addition to failing to establish the first and seminal issue of her *Monell* claim – a

violation, Plaintiffs have additionally failed to produce any evidence of a constitutionally

deficient custom, practice, or policy.  At the time of the incident involving Mr. Aichholz,

Lancaster Defendants had policies in place that addressed an inmate's suicide status and block

checks thereof. Sgt. Klinger, CO Christner, CO Carpineli, CO Jones and CO Snodderly all recall

either reading, reviewing and/or receiving training on these policies.  The policies/procedures of

Lancaster County Prison have been found to be effective and satisfactory per both (1) the

Commonwealth of Pennsylvania, Department of Corrections and (2) the National Commission

on Correctional Health Care ("NCCHC").  *See* Exhibits E and F.

Numerous courts have found that where a state imposes training standards, evidence

showing adherence to those standards, such as LCP's meeting compliance with the Department

of Correction's standards, bars any finding that the public entity was "deliberately indifferent".

*See*, *e.g.*, *Carswell v. Borough of Homestead*, 381 F.3d 235, 245 (3d Cir. 2004); *Tapia v. City of*

*Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992); *Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 931 (E.D. of Wis. 1999); and *Williams v. Musser*, 1997 WL 403509, at *10 (N.D. of Il1. 1997).

Accordingly, there is no evidence presented that Lancaster County had a deficient custom, practice or policy as it related to suicide prevention.  Therefore, summary judgment should be entered for the Lancaster Defendants.

### 3. Plaintiffs Fail to Establish That Lancaster County Prison's Training Was Inadequate

Lancaster Defendants did not fail to adequately train, supervise, and discipline their employees, regarding the treatment of inmates who presented with risk factors for suicide.  First, at the time of his attempted suicide, Mr. Aichholz did not present any suicide factors because he was on POIII status, continuously received mental health treatment from PrimeCare, and the Lancaster Defendants did not prohibit or otherwise interfere with Mr. Lausell's receipt of mental health treatment from PrimeCare.

Second, there are no facts of record that show a failure of training to the LCP staff.  On the contrary, testimony from the named Lancaster Defendants demonstrate that training was provided regarding suicidal behaviors and status.  Specifically, Sgt. Klinger received training on suicide prevention during basic training as well as during annual refresher training that also included training on block checks; he is aware of warning signs of suicidal behavior.  CO Marcus Jones received training on suicides to become a Correctional Officer and had annual training on suicide prevention that included verbal and behavioral clues.  CO Snodderly recalled receiving training on what they are supposed to do for suicide watches, he is also sure he received annual training to recognize verbal and behavioral clues that indicate potential suicide and how to respond appropriately.  CO Carpinelli recalled one (1) to two (2) days of training

dedicated to the concern of suicide and suicide completions [sic] and what to do if you were

concerned about any of it; he also received training on behavioral ques.

      Accordingly, Plaintiffs have simply failed to point to any deficient policy or practice of

Lancaster County that "caused" Mr. Aichholz's suicide. Instead, the record demonstrates that the

policies and practices of LCP, which was continually accredited by both the National

Commission on Correctional Health Care and the Pennsylvania Department of Corrections, had

adequate suicide prevention policies, practices, and training in place at the time of Mr.

Aichholz's suicide. Therefore, Plaintiff's *Monell* claim against Lancaster County fails as a matter

of law.

      **D.**    **Plaintiff's Wrongful Death and Survival Claims Fail**

      Plaintiffs assert Wrongful Death and Survival Action claims against the Lancaster

Defendants. However, Plaintiffs' claims under state law are barred by the express provisions of

the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA").  42 Pa. C.S.A. § 8541, *et

seq.*[4] The general provision with respect to governmental immunity dictates that:

> Except as otherwise provided in this subchapter, no local agency
> shall be liable for any damage on account of any injury to a person
> or property caused by any act of the local agency or any employee
> thereof or any other person.

42 Pa. C.S.A. § 8541.  For a claim to be maintained against a local agency, two conditions must

be met. First, the damages sought in the present suit must be recoverable under the common

law, or a statute creating a cause of action absent the defenses provided in the act; and second,

that Plaintiffs' injury "was caused by the negligent acts of the local agency or employee thereof

---

[4] The PSTCA defines a local agency to which the immunity provision applies as a "government
unit other than the Commonwealth government."  42 Pa. C.S.A. § 8501.  Lancaster County is
clearly a "government unit other than the Commonwealth government" and is, therefore, covered
under the provision of the PSTCA.

acting within the scope of his office or duties with respect to one of the categories listed in subsection (b)." 42 Pa. C.S.A. § 8542(a).

Section 8542(b) provides that a local governmental agency is immune from any suit based upon the negligent acts of the agency or an employee, unless the cause of action relates to one of nine categories.[5]  None of these narrow exceptions apply in the present case, and thus, Plaintiffs' claims are barred*.  See Bornstad v. Honey Brook Twp.,* 2004 U.S. Dist. LEXIS 9690 at *14 (E.D. Pa. 2004)(holding that "Plaintiff's wrongful death and survival claims against [the municipality defendants] are barred by the Tort Claims Act and must be dismissed"); *Burkhart v. Knepper,* 310 F. Supp. 2d 734, 742-44 (W.D. Pa. 2004) (dismissing a plaintiff's survival and wrongful death claims under the Pennsylvania Political Subdivision Tort Claims Act); *see also Heckenswiler v. McLaughlin,* 2008 U.S. Dist. LEXIS 76771 (E.D. Pa., September 29, 2008); *Puza v. Carbon County (In re Estate of Stephen Puza)*, 586 F.Supp.2d 271 (M.D. Pa., September 26, 2007).  Moreover, "the liability of local agency employees cannot exceed the liability of their employing agency." 42 Pa. C.S.A. §8545; *see also Francis v. Northumberland County*, 636 F.Supp.2d 368 (M.D. Pa., July 7, 2009).  Therefore, since Lancaster County is not liable on the wrongful death claim, the individual Lancaster Defendants also cannot be liable.

Furthermore, "The Pennsylvania Wrongful Death and Survival Act . . . did not create a new theory of liability but merely allowed a tort claim of the decedent to be prosecuted." *Simmons v. Simpson House, Inc.*, 259 F. Supp. 3d 200, 209 (E.D. Pa. 2017) (citing *Bright v. Westmoreland Cty.*, 380 F.3d 729, 741 (3d Cir. 2004).  "Thus, if the underlying tort theory

---

[5] The nine exceptions to immunity are: (1) vehicle liability; (2) the care, custody or control of personal property; (3) the care, custody or control of real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; (8) the care, custody or control of animals or (9) sexual abuse.  42 Pa. C.S.A. § 8542(b).

[fails], then the wrongful death or survival claim will fail." *Simmons*, 259 F. Supp. 3d at 209

(citing *Bright*, and *Becker v. Carbon Cty.*, 177 F. Supp. 3d 841, 847 (M.D. Pa. 2016)).

Accordingly, Plaintiffs' Wrongful Death and Survival Action fail.

## E.    **Plaintiffs' Claim for Punitive Damages Fails**

At minimum, Plaintiffs' claim for punitive damages against Sgt. Klinger, CO Snodderly,

and CO Jones should be dismissed. "A court cannot impose a punitive damage award against an

official acting in his or her individual capacity unless the actor's conduct is, at a minimum,

reckless or callous." *Startzell v. City of Philadelphia*, 2007 U.S. Dist. LEXIS 4082, at *75 (E.D.

Pa., January 18, 2007)(Stengel, J.)(citing *Brennan v. Norton*, 350 F.3d 399, 428-29 (3d Cir.

2003)). As discussed more fully above, there is simply nothing in the record to support a finding

that the individually named Lancaster Defendants – Sgt. Klinger, CO Snodderly, and CO Jones –

had any knowledge that Decedent was a suicide risk, in fact CO Jones was not assigned to the

same block as Mr. Aichholz and CO Snodderly were on break. Thus, it simply cannot be said

that they acted callously or recklessly disregarded Mr. Aichholz's "constitutional rights".  As

such, Plaintiff's claim for punitive damages against Sgt. Klinger, CO Snodderly, and CO Jones

must be dismissed as a matter of law.

## VII.    **CONCLUSION**

Based on the foregoing Defendants, Lancaster County, Sgt. Klinger, CO Snodderly, and

CO Jones respectfully request This Honorable Court enter an Order granting summary judgment

in their favor and against Plaintiff, *with prejudice*, in accordance with Federal Rule of Civil

Procedure 56.

Respectfully submitted,

**MacMain Leinhauser PC**

Date: October 17, 2023        By:     */s/ David J. MacMain*
David J. MacMain
PA Attorney I.D. No. 59320
Matthew S. Polaha
PA Attorney I.D. No. 320674
433 W. Market Street, Suite 200
West Chester, PA 19382
*Attorney for Defendants, Lancaster County,*
*Sergeant Philip Klinger, Officer Marcus*
*Jones, and Correctional Officer Randall*
*Snodderly*

## CERTIFICATE OF SERVICE

I, David J. MacMain, Esq., hereby certify that on this 17th day of October 2023, a copy of

the foregoing *Defendants, Lancaster County, Sergeant Philip Klinger, CO Marcus Jones, and*

*CO Randall Snodderly's Brief in Support of their Motion for Summary Judgment* was served

upon all counsel of record via ECF:

Nancy J. Winkler, Esquire
Todd Schoenhaus, Esquire
Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C.
1634 Spruce Street
Philadelphia, PA 19103
*Attorney for Plaintiffs*

John R. Ninosky, Esquire
Marshall Dennehey Warner Coleman & Goggin
100 Corporate Center Drive, Suite 201
Camp Hill, PA 17011
*Attorney for PrimeCare Defendants*

Respectfully submitted,

**MacMain Leinhauser PC**

By:    */s/ David J. MacMain*
       David J. MacMain
       PA Attorney I.D. No. 59320
       Matthew S. Polaha
       PA Attorney I.D. No. 320674
       433 W. Market Street, Suite 200
       West Chester, PA 19382
       *Attorney for Defendants, Lancaster County,*
       *Sergeant Philip Klinger, Officer Marcus*
       *Jones, Officer Jeffrey Christner,*
       *Correctional Officer Randall Snodderly, and*
       *Correctional Officer Nicholas Carpinelli*