**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CYNTHIA BINGHAM, | : |
|         Plaintiff, | : |
| | : |
|     v. | :    Civil No. 5:22-cv-02769-JMG |
| | : |
| LANCASTER COUNTY, *et al.*, | : |
|         Defendants. | : |

**MEMORANDUM OPINION**

GALLAGHER, J.                                                                                        **January 2, 2024**

## I.   OVERVIEW

Tragically, Justin Aichholz hung himself in Lancaster County Prison ("LCP") on July 17, 2020 and died the next day—five days after being admitted to LCP and three days after his thirtieth birthday. Mr. Aichholz had attempted suicide several times before. His most recent attempt was on July 11, 2020, just hours before his incarceration at LCP.

Mr. Aichholz's mother, Cynthia Bingham, brought this suit on behalf of Mr. Aichholz's estate against Lancaster County, LCP's mental healthcare provider, three of the provider's mental healthcare staff, and three of the prison's correctional officers. Plaintiff claims that these Defendants violated Mr. Aichholz's Fourteenth Amendment right to be free from cruel and unusual punishments. Plaintiff also brings a survival action and wrongful death claim against all Defendants. She further claims that PrimeCare, Defendant Cattell, Defendant Birriel, and Defendant Grimm ("PrimeCare Defendants") committed malpractice in their treatment of Mr. Aichholz.

All Defendants have moved for summary judgment. For the following reasons, the Court must grant summary judgment in part. Summary judgment is granted in favor of Lancaster County,

Defendant Jones, Defendant Klinger, and Defendant Snodderly ("Lancaster Defendants") on all counts. The Court must also grant summary judgment in favor of PrimeCare and Defendants Catell and Birriel on the Fourteenth Amendment and medical malpractice claims. However, Plaintiff's Fourteenth Amendment claim will proceed against Defendant Grimm, as will her medical negligence claim. Finally, Plaintiff's wrongful death and survival action will proceed against the PrimeCare Defendants.

## II.   FACTUAL BACKGROUND

### A.   Allegations

#### 1.   Mr. Aichholz's background

Mr. Aichholz led a challenging life; enduring physical and sexual abuse during his childhood. In adulthood, Mr. Aichholz suffered from seizures and a traumatic brain injury. He was also diagnosed with bipolar I disorder, depression, and post-traumatic stress disorder. He also grappled with severe substance abuse issues regarding opioids, methamphetamine, and alcohol. His grandfather, a major source of support in Mr. Aichholz's life, died in 2019. And at the time of Mr. Aichholz's incarceration at LCP, he was homeless.

Mr. Aichholz had a history of suicidality. He attempted suicide in 2005 by handgun, was hospitalized for suicide ideation in 2020, and attempted suicide by pills later in 2020 (which was connected to his arrest and incarceration at LCP). There is some dispute in the briefing as to whether Mr. Aichholz's recent suicide attempt by pills was in fact a suicide attempt. He reported ingesting a large amount of Xanax and gabapentin (an anti-convulsant used to treat seizures) to harm himself. *See* JA 000183. Yet he did not develop any symptoms related to overdose, which led him to believe the pills he took may have been "fake." *See* JA 000185. Mr. Aichholz still reported suicidal thoughts at the time of his discharge, however, which is why he was transferred

to LCP on suicide watch. *See id.* Although, while in LCP custody, Mr. Aichholz denied intentionally overdosing several times. *See* PrimeCare Defs.' Statement of Undisputed Facts at ¶¶ 48, 59, 63–65, 87, 91, 100, 107, 110, 119, 122, 139, 142–43, 154.

## 2. LCP's Suicide Watch Procedures

When an inmate enters LCP, they are screened to determine the inmate's suicide risk. Depending on the results of that screening, an inmate can be placed on one of four watch statuses. The three watch statuses that are relevant to this suit are referred to as "Level 1," "Level 2," and "Level 3."

Level 1 watch is intended for inmates who are not actively suicidal but are at a moderate to high risk of suicide and demonstrate concerning behavior indicating the potential for serious self-harm. An inmate on Level 1 watch is placed in a stripped cell, which will include a camera where possible. He is provided a suicide smock and a suicide blanket.[1] His meals are served with a paper spoon. He is not allowed socks, shoelaces, sheets, or underwear and allowed only a single book. Corrections officers must check on a Level 1 inmate no less than once every fifteen minutes.

Level 2 watch is intended for inmates who are not actively suicidal but present a risk of suicide, albeit lower than Level 1. An inmate on Level 2 watch is subject to many of the same restrictions as Level 1, except he is provided a jumpsuit instead of a safety smock, a regular spork instead of paper utensils, and he is allowed a bible and shower shoes.

Level 3 watch is a step below Level 2 watch. On Level 3 watch, an inmate is placed in an ordinary cell and has all the same privileges as any other inmate. Corrections officers observe the at-risk inmate no less than once every thirty minutes. Level 3 watch is not, strictly speaking,

---

[1] These items are designed in such a way that a distraught inmate cannot use them to injure himself. For instance, they lack any zippers or buckles that could be swallowed or used to cut oneself. They also cannot be ripped and fashioned into a rope.

appropriate for "suicide prevention." LCP Suicide Prevention and Intervention, Pl.'s Response Exhibit A at 6 (ECF No. 70-1) (filed under seal). Instead, it is used as a stepdown procedure from suicide watch and, generally, when an inmate's behavior "warrants closer observation." *Id.*

### 3.  Mr. Aichholz's Timeline While in LCP Custody

When Mr. Aichholz first entered LCP, on July 11, 2020, he informed the corrections officer conducting his intake process that he attempted suicide earlier that day. *See* PrimeCare Defs.' Statement of Undisputed Facts at ¶ 24. A social worker then conducted a medical intake, and Mr. Aichholz denied ever attempting suicide and stated that he was not presently suicidal. *See id.* at ¶ 26–27; JA 000065. Despite Mr. Aichholz's denial of suicidality, the social worker placed him on Level I watch, *see* PrimeCare Defs.' Statement of Undisputed Facts at ¶ 29; he was also placed into a detox program, *see id.* at ¶ 34–36. Level I watch and the detox program required at least daily evaluation by medical staff. *See id.* at ¶ 45; LCP Suicide Prevention and Intervention, Pl.'s Response Exhibit A at 3 (ECF No. 70-1) (filed under seal).

As part of Mr. Aichholz's status on suicide watch and detox, corrections officers and PrimeCare workers were required to check on him throughout the day. The corrections officers were required to perform block checks in no less than fifteen-minute intervals while Mr. Aichholz was on suicide watch. Pl.'s Ex. A[2] Confidential Block Check Policy, 2–3 (ECF No. 70-2). When Mr. Aichholz was no longer on suicide watch, the officers were required to perform block checks every half hour. *See id.* at 2. The parties do not dispute that these checks occurred, but Plaintiff alleges that they did not meaningfully occur—that the corrections officers failed to comply with the policy by only "glancing" into the cell; sometimes for less than a second.

---

[2] Plaintiff labelled various exhibits within the same filing "Exhibit A."

Following his initial screening, PrimeCare staff met with Mr. Aichholz seventeen times during his time at LCP. They met with Mr. Aichholz once a day according to his mental health status and at least twice a day according to the detox program. The following is a brief description of those meetings:

- July 12 – PrimeCare met with Mr. Aichholz twice. *See* PrimeCare Defs.' Statement of Undisputed Facts at ¶¶ 46, 57. Mr. Aichholz exhibited mild to minimal withdrawal symptoms, denied having thoughts of self-harm, negative visits with family or friends, and any negative judicial proceedings.

- July 13 – PrimeCare met with Mr. Aichholz four times. *See id.* at ¶¶ 60, 75, 80, 83. Mr. Aichholz denied being suicidal and stated that his recent alleged attempt (on July 11) was in fact an attempt to escape or lessen a drug charge. *See id.* at ¶ 64. Defendant Grimm stepped down Mr. Aichholz from Level I suicide precautions to Level II. During his detox sessions, Mr. Aichholz presented minimal to moderate withdrawal symptoms.

- July 14 – PrimeCare met with Mr. Aichholz three times. *See id.* at ¶¶ 85, 88, 98. Mr. Aichholz presented minimal to mild withdraw symptoms and denied having any thoughts of self-harm, negative visits with family or friends, and any negative judicial proceedings. Mr. Aichholz shared that he was depressed and requested a cellmate.

- July 15 – PrimeCare met with Mr. Aichholz three times. *See id.* at ¶¶ 105, 108, 117. Mr. Aichholz presented no to mild withdrawal symptoms and denied having any thoughts of self-harm, negative visits with family or friends, and any negative judicial proceedings. He rated his overall condition as an eight out of ten

- July 16 – PrimeCare met with Mr. Aichholz three times. *See id.* at ¶¶ 120, 124, 137. Mr. Aichholz denied having thoughts of self-harm, negative visits with family or friends, and any negative judicial proceedings. He again stated that his July 11 overdose was not a suicide attempt, but an attempt to escape a drug possession charge. Mr. Aichholz presented no to mild withdrawal symptoms.

- July 17 – PrimeCare met with Mr. Aichholz twice. *See id.* at ¶¶ 140, 152.  Mr. Aichholz presented no to mild withdrawal symptoms. He also denied being suicidal but rated himself six or seven out of ten—a deterioration from his self-rating the day before. Defendant Grimm stepped down Mr. Aichholz's suicide precautions from Level II to Level III.

Mr. Aichholz hung himself in his cell on July 17, 2020; about seven hours after Defendant Grimm removed him from suicide watch.

### B. Procedural History

Plaintiff filed this suit on July 17, 2022. *See* ECF No. 1. The PrimeCare Defendants filed a motion to dismiss arguing Plaintiff had failed to adequately plead her claims. *See* ECF No. 24. The Court denied that motion and ordered Plaintiff to file an amended complaint to correct a labelling error, *see* ECF No. 36, and the parties proceeded to discovery. After the close of discovery, all Defendants filed motions for summary judgment on all federal counts and requested this Court not exercise supplemental jurisdiction over the remaining state law claims. *See* ECF No.s 49, 56. Shortly thereafter, the parties stipulated to the dismissal of three individual defendants: Defendants Christner, Carpinelli, and Otero. *See* ECF No. 60.

## III.    LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). And a fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

## IV.    ANALYSIS

The Court will address Plaintiff's claims under § 1983 first and then address Plaintiff's state law claims.

### A.  Plaintiff's claims under § 1983

Under the Fourteenth Amendment[3] to the United States Constitution, an incarcerated individual that has been convicted of a crime has the right to be free from "cruel and unusual punishments." U.S. Const. amend. VIII. This constitutional provision prohibits carceral custodians from exhibiting "deliberate indifference" to an inmate's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

An inmate's vulnerability to suicide can represent a serious medical need. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). Specifically, a defendant violates an inmate's Fourteenth Amendment right when three conditions are satisfied: (1) the inmate was "particularly vulnerable to suicide," (2) the defendant "knew or should have known" of the inmate's vulnerability, and (3) the defendant acted with "reckless or deliberate indifference" toward that vulnerability. *Palakovic v. Wetzel*, 854 F.3d 209, 223–24 (3d Cir. 2017).

Here, Plaintiff has come forward with sufficient evidence that Mr. Aichholz was particularly vulnerable to suicide. An inmate is particularly vulnerable to suicide when there is a "strong likelihood, rather than a mere possibility," that he will harm himself. *Palakovic*, 854 F.3d at 222 (internal quotation marks omitted). An inmate's "strong likelihood" of suicide must be "so obvious" that "a lay person would easily recognize the necessity for preventative action." *Id.*

---

[3] Inmate suicides that occur in state prisons before an individual is sentenced are evaluated under the Fourteenth Amendment's Due Process Clause, whereas inmate suicides that occur after an individual has been sentenced are evaluated under the Eighth Amendment. *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 n.5 (3d Cir. 2005). But the Third Circuit has not yet identified any difference between the substantive standards that apply under either provision and has instead generally treated prison suicide claims under the Eighth and Fourteenth Amendment as "essentially equivalent." *Palakovic v. Wetzel*, 854 F.3d 209, 223–24 (3d Cir. 2017). Accordingly, the Court will draw from Eighth and Fourteenth Amendment precedents interchangeably.

(internal quotation marks omitted). An inmate's particular vulnerability to suicide must be evaluated on the "totality of the facts presented." *Id.* at 230.

Mr. Aichholz had attempted suicide twice before his July 17 death[4] and had exhibited suicidal ideation on at least three separate occasions, including in April of 2020 for which he was hospitalized, *see* Pl.'s Exhibit D, 6 (ECF No. 71-5). His two most recent instances of suicidal ideation occurred in the days before his death. Before being transferred to LCP, while in the care of Lancaster General Hospital for his attempted suicide, he said he was going kill himself upon learning that he would be transferred to LCP. Then, while at LCP on the night before his death, Mr. Aichholz spoke to his girlfriend on a recorded telephone line and stated "I'm not good. I'm not good at all. I'm in my cell by myself. I am doing everything I can to not take my mother fucking life, because that's how upset I am." JA 000048. He also was diagnosed bipolar and had a history of depression and mania among other conditions. Pl.'s Ex. S, 5 (Johnson Expert Report, ECF No. 71-20). Indeed, when Mr. Aichholz first entered LCP, he was placed on Level I watch (the highest level) specifically because he presented a significant risk of attempting suicide, in part due to his admission that he attempted suicide earlier that day, subsequent denials notwithstanding. *See* PrimeCare Def.s' Statement of Undisputed Facts at ¶ 24.

Defendants resist this conclusion by arguing that Mr. Aichholz could not have been particularly vulnerable to suicide because he consistently denied having suicidal thoughts. But, in the first place, Mr. Aichholz's denials came after he initially shared with LCP that he did attempt

---

[4] Mr. Aichholz attempted suicide by firearm in 2005. *See* Pl.'s Exhibit B, PCM 2000 (ECF No. 71-2). And despite Defendants' suggestion that Mr. Aichholz's July 11, 2020 overdose was not a suicide attempt, viewing this event in the light most favorable to Plaintiffs, the Court disagrees and views Mr. Aichholz's decision to swallow 50 and 80 pills of Xanax and seizure medication respectively as an attempt to commit suicide. The Court reaches this conclusion given Mr. Aichholz's history of suicidality and his subsequent statements confirming that he tried to kill himself.

suicide. *See* PrimeCare Def.s' Statement of Undisputed Facts at ¶ 24.  More importantly, though, Mr. Aichholz's denials of suicidality do not establish as a matter of law that he was not particularly vulnerable to suicide. To the contrary, Plaintiff has produced testimony from Defendant Grimm—the PrimeCare social worker who stepped down Mr. Aichholz's suicide precaution level each time—that medical professionals should not rely exclusively on an inmate's denials of suicidality when their behavior and/or history suggests otherwise. *See* Grimm Dep. 50:21–51:11, JA 000947–48.

Mr. Aichholz's objective vulnerability to suicide is not a difficult issue in this case. The more difficult issue is whether the Defendants had the mental state required to violate the Fourteenth Amendment—specifically, whether each defendant *knew or should have known* of Mr. Aichholz's vulnerability and was *deliberately indifferent* toward it.

### 1.  The Corrections Officers: Defendants Klinger, Jones, and Snodderly

The Court finds that Plaintiff has not produced sufficient evidence for a reasonable juror to conclude that Defendants Klinger, Jones, or Snodderly possessed the requisite mental state to be liable on Plaintiff's § 1983 claim. Accordingly, the Court must grant the Lancaster Defendants' motion for summary judgment as to Defendants Klinger, Jones, and Snodderly.

A defendant violates an inmate's Fourteenth Amendment right only if the defendant "knew or should have known" of the inmate's particular vulnerability to suicide. *Palakovic*, 854 F.3d at 231. The facts of *Colburn* shed light on how much knowledge a custodial defendant must have of an inmate's suicide risk before his subjective knowledge reaches the standard required to violate the Fourteenth Amendment. In *Colburn*, the plaintiff had produced evidence suggesting the defendant knew that the inmate was intoxicated, that she had recently had an argument with her boyfriend, that she had tried to ingest three pills during her time in custody that day, and that a

bullet had also been found and removed from the inmate's pocket while she was in custody that same day. 946 F.2d at 1026. There was also evidence that the inmate had observable scarring on her lower forearm indicating a previous suicide attempt. *Id.* But there was no evidence indicating the defendant knew that the inmate had previously been diagnosed with a "mental illness characterized by a high risk of self-inflicted harm" or that the defendant was aware of anything else in the inmate's past "suggesting that she had a particular vulnerability to suicide." *Id.*

In *Colburn*, the inmate ultimately used a gun that she had secreted into custody to commit suicide. 946 F.2d at 1021. But the Third Circuit concluded that, on the summary judgment record described in the preceding paragraph, there was not enough evidence for a reasonable juror to conclude that the defendant subjectively knew of the inmate's particular vulnerability to suicide. *Id.* at 1027.

Here, Plaintiff has produced only circumstantial evidence suggesting that Defendants Klinger, Jones, or Snodderly knew about Mr. Aichholz's particular vulnerability to suicide. Plaintiff's primary argument is that these Defendants knew Mr. Aichholz was on Level III watch, and recently on Level II and Level I, and supports this argument with two pieces of evidence. First, Plaintiff notes that Defendant Snodderly was assigned to Mr. Aichholz's prison unit while he was on Level II watch and conducted block checks as required by the prison's suicide prevention protocol. Pl.'s Opp'n to Lancaster Def.'s Mot. Summ. J., 18. Second, as to each of these Defendants, Plaintiff directs us to the inmate log reports, which denote changes in Mr. Aichholz's watch status. *Id.* But this argument is insufficient, and in any case flawed, to support a reasonable conclusion that Defendants Klinger, Jones, or Snodderly were subjectively aware of Mr. Aichholz's particular vulnerability to self-harm.

First, these Defendants' awareness that Mr. Aichholz was on Level III watch does little to support an inference that they knew he was particularly vulnerable to self-harm. Level III watch is the least protective form of watch under LCP's policies and is specifically described in those policies as inappropriate for inmates presenting a risk of suicide. LCP Suicide Prevention and Intervention, Pl.'s Response Exhibit A at 6 (ECF No. 70-1) (filed under seal) ("[Level III watch] is not used for suicide prevention, but reserved for the inmates whose behavior warrants closer observation."). Level III watch specifically permits an inmate to be placed in a general population unit rather than a mental health unit, does not require constant observation, and does not restrict the items an inmate may keep in his cell. And there is no evidence suggesting that these Defendants previous experiences with suicide prevention protocols would cause them to believe inmates on Level III watch in their general population unit were at risk of committing suicide.

Second, there is no evidence that these Defendants knew about Mr. Aichholz's history of suicidality, drug abuse, or mental health diagnoses. To the extent these Defendants became aware of Mr. Aichholz's relevant history from interacting with him during his six-day incarceration at LCP, there is no evidence that these Defendants interacted with Mr. Aichholz beyond conducting block checks, which the record indicates is not an interaction that lends itself to in-depth discussions between inmates and guards. Although Plaintiff challenges the adequacy of Defendants' block checks, the policy itself requires no discussion but only that a guard observe each inmate long enough to ensure that they are not in distress. *See* Pl.'s Opp'n to Lancaster Def.s' Mot. for Summ. J., 19–20. Defendant Klinger, unlike Defendants Snodderly and Jones, lacked even this interaction since, as a supervisor, he did not perform block checks. And although Defendant Jones did conduct a single block check, that was the only time he was on Mr. Aichholz's cell block because he was filling in for another.

In sum, construing all Plaintiff's evidence in the light most favorable to Plaintiff yields the following picture. At the time of Mr. Aichholz's suicide, Defendants Snodderly, Klinger, and, perhaps Jones[5] knew that Mr. Aichholz had been identified as an inmate who needed further observation. Defendants Snodderly and Klinger knew he had originally been identified as an inmate with at least a moderate risk of suicide and had shown improvement given his stepped down status. Defendants Snodderly and Klinger additionally knew that Mr. Aichholz had frequently met with mental health providers but had otherwise caused no issues requiring Defendants' attention.

Yet like the defendant in *Colburn*, Defendants Snodderly, Klinger, and Jones did not know of Mr. Aichholz's mental health diagnoses or have information about his previous suicide attempts beyond the information they could infer from his watch level. And unlike the defendant in *Colburn*, who had found two means of committing suicide on the inmate, these Defendants did not observe anything in Mr. Aichholz's cell or on his person indicating that he had the intent and ability to commit self-harm.

Quite simply, Defendants Snodderly, Klinger, and Jones had substantially less reason to know of Mr. Aichholz's vulnerability to suicide than the defendant in *Colburn* had to know about his inmate's vulnerability to suicide. Just as in *Colburn*, then, no reasonable juror could conclude that Defendants Snodderly, Klinger, or Jones knew of Mr. Aichholz's vulnerability to suicide.

### 2.   Individual Healthcare Providers Cattell and Birriel

The Court also finds that no reasonable juror could conclude that Defendants Cattell nor Birriel violated Mr. Aichholz's Fourteenth Amendment rights.

---

[5] Defendant Jones was only on Mr. Aichholz's block for a single check.

As with all Section 1983 suits, "[t]raditional tort concepts of causation inform the causation inquiry on a § 1983 claim." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007) (citing *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005)). A plaintiff alleging deliberate indifference "must show that the defendant was the 'moving force' behind the alleged deprivation of his federal rights." *Id.* (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)).

Plaintiff has failed to establish that Defendant Cattell and Birriel's actions were even but-for causes of Mr. Aichholz's death. As discussed above, Defendant Grimm's decision to remove Mr. Aichholz from suicide watch, based on the record, could reasonably support a finding by a jury in favor of Plaintiff. But neither Defendant Cattell nor Birriel meaningfully contributed to that decision.

Plaintiff argues that Defendant Catell is liable for "prescribing"[6] Klonopin—a detox drug with side effects including increased depression and suicidal thoughts—and failing to supervise Defendant Grimm. Regarding Klonopin, it is quite a leap to vaguely state that Klonopin's side effects include depression and suicidal thoughts and conclude on that basis that Klonopin caused Mr. Aichholz's suicide. It is common knowledge that most drugs include any number of unseemly, *potential* side effects that affect some number of users. Yet Plaintiffs have not presented evidence that prescribing Klonopin to treat the anticipated withdrawal symptoms of a suicidal inmate is outside of the standard of care—even when that inmate is seen by medical professionals at least three times a day. The Court also notes that Plaintiff's experts do not claim that Klonopin was

---

[6] The Court assumes *arguendo* that Dr. Cattell was responsible for prescribing Klonopin. Though the parties disagree on this point, their dispute is immaterial because even granting Plaintiffs the point, Defendant Cattell is not liable.

inappropriate to treat Mr. Aichholz's detox. This theory of liability would be insufficient to meet even a common negligence standard, let alone deliberate indifference.

Plaintiff's argument regarding Defendant Birriel is equally unpersuasive. Defendant Birriel met with Mr. Aichholz on three consecutive days and maintained his Level II watch status. During that time, Defendant Birriel also documented her concerns for Mr. Aichholz's questionable stability and the truth of his denials of suicidality. Despite these actions, Plaintiff alleges that Defendant Birriel is liable because she did not verbalize Mr. Aichholz's request for a cellmate and placed in her notes that he posed a "low risk of harm to [him]self and others," Pl.'s Opp'n to the PrimeCare Def.s' Mot. for Summ. J at 19 (ECF No. 66), which was a minimization according to Plaintiff and Plaintiff's Expert Acosta.[7] Neither of these points, however, are but-for causes of Mr. Aichholz's death let alone the "moving force" behind it.

### 3.   Individual Healthcare Provider Grimm

However, the Court finds that there are genuine disputes of fact regarding Defendant Grimm that must be decided at trial.

The deliberate indifference standard requires a more culpable state of mind than negligence. *Farmer*, 511 U.S. at 835; *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). A plaintiff must come forward with evidence supporting more than a "mere disagreement" about an inmate's "proper medical treatment" to prove deliberate indifference. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (internal citations omitted). A plaintiff need not establish that a custodian had "a subjective appreciation of the detainee's particular vulnerability.

---

[7] There are pending motions to limit or exclude the testimony of each of Plaintiff's experts. ECF No.s 51–54. To the extent that this opinion relies on Plaintiff's experts, it does not rely on any contested testimony.

Rather, the Third Circuit has held that 'reckless or deliberate indifference to that risk' only demands something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Palakovic*, 854 F.3d at 231 (internal citations omitted) (quoting *Woloszyn*, 396 F.3d at 320).

Here, Mr. Aichholz's medical history that Defendant Grimm knew or should have known, taken alongside her actions, create issues of fact as to whether she acted with deliberate indifference. Unlike Defendants Cattell and Birriel—where the Court had no reason to reach the subjective prongs under the Fourteenth Amendment owing to the clear lack of causation—Defendant Grimm initiated each of Mr. Aichholz's reductions in watch status. The Court addresses this issue in two steps: first as to Defendant Grimm's mental state and, next, whether her conduct rose to deliberate indifference.

There is a genuine dispute of fact as to whether Defendant Grimm knew or should have known that Mr. Aichholz was particularly vulnerable to suicide. Mr. Aichholz was transported to LGH after ingesting nearly one-hundred pills. He told medical personnel at LGH that this was "an attempt to harm himself," and that he was also addicted to heroin and alcohol. JA 000183. Although he did not develop symptoms of overdose while in the care of LGH, his chart indicates that the pills he ingested may have been "fake" since he "bought the pills off the street."[8] JA 000185. When LGH discharged Mr. Aichholz to LCP custody, he was discharged with a diagnosis of intentional overdose. JA 000183. The final notes in Mr. Aichholz's LGH chart state "[Mr. Aichholz] does continue to endorse suicidal thoughts. So he will be discharged into police custody on suicide watch." JA 000185.

---

[8] Whether these pills were in fact what Mr. Aichholz's originally believed them to be is besides the point. The record indicates that at the time he ingested them, Mr. Aichholz believed these to be pills that would harm or even kill him when ingested as he did.

Once in LCP custody, Mr. Aichholz's initial self-reporting during intake aligned with his statements to LGH. He shared that his overdose was an attempt at suicide and that he was addicted to heroin and alcohol. JA 000181. But he later contradicted these statements during his subsequent medical intake when he denied that the overdose was intentional. JA 000064. Notwithstanding this denial, he was placed on Level I suicide watch, which is the most precautious level. JA 000074. He also self-reported prior psychiatric hospitalizations and requested mental health services. JA 000065,

Defendant Grimm first met with Mr. Aichholz on July 13, his second day in LCP. She was aware of Mr. Aichholz's recent overdose, that LGH categorized that incident as an intentional overdose, and that he told LCP intake that the overdose was a suicide attempt. *See* JA 001116–17 (J. Grimm Dep.). During that first meeting, Mr. Aichholz told Defendant Grimm that his overdose was not a suicide attempt, but only an attempt to escape additional drug charges. Brief of the PrimeCare Def.s in Support of Their Mot. for Summ. J at 10. But Defendant was also aware of the concept "manipulation." JA 000936–37 (J. Grimm Dep.). In suicide contexts, manipulation occurs when patients recast their suicide attempts as insincere acts used to manipulate others. Medical professionals are instructed not to exclusively rely on such statements when a patient's behavior— such as ingesting nearly one hundred pills—conflicts with their denials. And Defendant Grimm was so trained. *Id.* at JA 000936–37, 47–48.

In addition, Defendant Grimm should have been aware of other aspects of Mr. Aichholz's file suggesting that he was particularly vulnerable to suicide, his denials notwithstanding. For example, Defendant Birriel noted in Mr. Aichholz's case file that she questioned his mental stability and the truth of his self-reported mental health improvements. Also, during his 2017 incarceration in LCP, PrimeCare records that were available to her—but that she did not review—

showed Mr. Aichholz was administered psychotropic drugs, which indicated prior mental health treatment and was "definitely very important information that would help in a decisionmaking [sic] process." JA 001051 (J. Grimm Dep.). And in her final session with Mr. Aichholz, just hours before he committed suicide, Defendant Grimm removed Mr. Aichholz from suicide watch noting that he had "significantly improved," which is notable since he assessed himself lower than he did during his previous session with Defendant Grimm and his court date was approaching. JA 000159, 69.

Taken together, these facts create a triable issue. The Court finds that a reasonable juror could conclude on these facts that Defendant Grimm knew or should have known that Mr. Aichholz was particularly vulnerable to suicide.

The PrimeCare Defendants cite to several cases in their argument for summary judgment, but each of these is distinguishable. This case is not like *Estate of Thomas v. Fayette County*, where the healthcare provider defendants offered unopposed expert reports to establish the lack of genuine issues for trial. 194 F. Supp. 3d 358, 375 (W.D. Pa. 2016). The opposite is true here: the PrimeCare Defendants moved for summary judgment without the aid of experts, and Plaintiff responded with expert reports that help establish triable issues of fact. This case is also distinguishable from *Michaux v. Temas*, where the inmate's "recent" suicide attempt was more than a year before his death. No. 2:17-CV-01241-JFC, 2020 WL 3799755, at *8 n.10 (W.D. Pa. July 7, 2020). And in *Woloszyn v. County of Lawrence*, the decedent had no record of prior suicide attempts at all. 396 F.3d at 317.

There is also a genuine dispute of fact as to whether Defendant Grimm was deliberately indifferent to Mr. Aichholz's particular vulnerability to suicide. To be liable on a deliberate indifference claim, a prison official must know (or should know) and disregard an excessive risk

18

to inmate health or safety. *See Woloszyn*, 396 F.3d at 321 (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir.2001)).

Mr. Aichholz entered LCP on Level I watch status, but Defendant Grimm reduced his watch status twice during his six days of incarceration. In her first meeting with Mr. Aichholz, which lasted ten minutes, she decided to disregard LGH's intentional overdose conclusion and Mr. Aichholz's statements confirming that conclusion in favor of Mr. Aichholz's contradictory statements. That decision led her to reduce Mr. Aichholz's watch status to Level II. JA 001101. It is unclear on this record why Defendant Grimm was so quick to accept Mr. Aichholz's denials of suicidality over the various indicators to the contrary—as opposed to Defendant Birriel, who documented her concerns for Mr. Aichholz's truthfulness. When asked about this decision in her deposition, Defendant Grimm indicated that she had "no problem overriding [LGH's] decision" because she had "seen a lot of questionable diagnoses and decisions . . . by the hospital in the course of her [thirteen-month] career." JA 001108. But later in her deposition, she explained that she doesn't have the medical training necessary to fully understand hospital records. JA 001057.

The speed with which Defendant Grimm removed Mr. Aichholz from suicide watch could also support a finding of deliberate indifference. Mr. Aichholz entered LCP on Level I suicide watch status, and in less than a week Defendant Grimm stepped him down twice. Her second step-down decision removed him from suicide watch entirely, and he killed himself eleven hours later. Defendant Grimm's speedy action is notable when considered alongside her decisions to disregard LGH's conclusions and to act before Mr. Aichholz's historical medical records had arrived. Though his stay was short, Mr. Aichholz's six days in LCP far exceeded the time within which PrimeCare workers are expected to reach out to outside providers for details about recent and

relevant treatment, s*ee* JA 002462 (T. Weber Dep. 159:13 – 161:20), but Defendant Grimm never did so.

Defendant Grimm's speedy step down decisions also set this case apart from other prison suicide cases dismissed against PrimeCare. In *Freitag v. Bucks County*, PrimeCare workers stepped down Mr. Freitag from Level II to Level III over the course of three months. 2022 WL 2703599, at *1 (E.D. Pa. July 12, 2022). But Defendant Grimm stepped down Mr. Aichholz from Level I to Level II to Level III in just six days.

Viewing the record in the light most favorable to Defendant Grimm, a reasonable juror could conclude that she acted with deliberate indifference.

### B. The Entities: Defendants PrimeCare and Lancaster County

The Court holds that no reasonable juror could conclude that either PrimeCare or Lancaster County are liable under Monell. The parties' briefing indicates that Plaintiff is pursuing Monell liability against PrimeCare on a theory of unconstitutional policies or customs and against Lancaster County on a theory of failure to train. Each of these theories is addressed in turn.

First, an entity will be held liable if it adopted a "policy or custom" that caused the constitutional violation at issue. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). The plaintiff must either identify a facially unconstitutional policy or custom or show that the facially lawful policy or custom was adopted with "deliberate indifference" to its "known or obvious consequences" for individuals' constitutional rights. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). A "policy" is a "final proclamation" announced by a "decisionmaker possessing final authority." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). A "custom" is "an act that has not been formally approved by an appropriate decisionmaker" but is "so widespread as to have the force of law." *Id.*

An entity may also be found liable under a "failure to train" theory. Liability under this approach requires "a plaintiff to identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur." *Palakovic*, 854 F.3d at 233 (quoting *Colburn*, 946 F.2d at 1030) (internal quotation marks omitted). Specifically, in prison suicide cases, a plaintiff must "(1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred and (2) demonstrate that the risk reduction associated with the proposed training is so great and so obvious" that failing to offer it "can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." *Id.*

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)) (quotation marks omitted). A county policymaker's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Id.* Such a pattern of similar constitutional violations puts the policymaker on notice that its training "is deficient in a particular respect," and without notice, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

### 1. PrimeCare

On this record, no reasonable juror could conclude that PrimeCare adopted a policy or custom that exhibited a deliberate indifference to inmates' serious medical needs. It is not enough

to identify shortcomings in Mr. Aichholz's treatment; Plaintiff had to present evidence creating a genuine issue of fact whether these shortcomings reflected an official policy or widespread custom. But despite extensive discovery and briefing, neither Plaintiff nor her experts connected alleged shortcomings to any specific policy or custom. *See* Pl.'s Memo. of L. in Opp'n to the PrimeCare Def.s' Mot. for Summ. J. at 26–27; Acosta Report at 10–15; Johnson Report at 14–15.

### 2.  Lancaster County

No reasonable jury could conclude that Lancaster County exhibited a deliberate indifference to inmates' serious medical needs—by adopting an unconstitutional policy, failing to train its policy, or by adopting a custom violative of the Constitution—on the briefing before the Court. The only Monell theory that Plaintiff seems to put forward against Lancaster County is a failure to train. Pl.'s Resp., 24 (ECF No. 69). Plaintiff states the "County did not produce any signed versions of [the suicide prevention training forms]." *Id.* But lacking is any analysis explaining how this fact, consistent with the *Palakovic*, establishes a triable issue. 854 F.3d at 233. Indeed, it was not until Plaintiff's surreply that the Court was even provided case citations involving relevant defendants. Some of these cases—though not all—are relevant, but none of them cure the evidentiary deficit.

The Supreme Court instructs us that a "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (2011) (quoting *Bryan Cty.*, 520 U.S. at 409) (quotation marks omitted). Plaintiff has not established a pattern of similarly (and allegedly) untrained LCP employees causing constitutional violations. Nor have they established in any other way that county policymakers were on notice that their training was deficient. Without this notice, and on

this record, no reasonable juror could conclude that the Lancaster County was deliberately indifferent.

### C. State Law Claims

#### 1. Medical Negligence Claims

Plaintiff's medical negligence claim will be dismissed against Defendants Cattell and Birriel but will proceed to trial against Defendant Grimm.[9]

To establish a cause of action for medical malpractice, the plaintiff must demonstrate: "1) the medical practitioner owed a duty to [her]; 2) the practitioner breached that duty; 3) the breach was the proximate cause of, or a substantial factor in, bringing about the harm that [she] suffered; and 4) the damages suffered were the direct result of the harm." *Osborne v. Lewis*, 59 A.3d 1109, 1114–15 (Pa. Super. 2012).

As discussed in more detail above, Plaintiff has not demonstrated that Defendant Cattell nor Birriel's conduct was even a but-for cause in Mr. Aichholz's death. In their Response, Plaintiff also argues that Defendant Grimm relied upon Defendant Birriel's "negligent assessment of [Mr. Aichholz's] suicide risk and incomplete recordkeeping." Yet Plaintiff has done nothing to establish this claim. In fact, the Court has already discussed how Defendant Grimm did not consider several parts of Defendant Birriel's notes.

#### 2. Wrongful Death and Survival Action

Lancaster County and Defendants Klinger, Jones, and Snodderly ("Lancaster Defendants") are immune from Plaintiff's wrongful death and survival actions according to Pennsylvania's Tort Claims Act ("Act") based on the record before the Court. The Act states that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any

---

[9] The Court's opinion will not address Defendant Grimm because the PrimeCare Defendants did not motion this Court to grant summary judgment in her favor.

injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. § 8541. The term "local agency" is defined as "a government unit other than the Commonwealth government." 42 Pa. Cons. Stat. § 8501.

The parties' dispute centers on whether any of the Lancaster County Defendants' conduct meets the Act's exception for willful misconduct. 42 Pa. Cons. Stat. § 8550. "Willful misconduct" under the Act means "misconduct which the perpetrator recognized was misconduct and which was carried out with the intention of achieving exactly that wrongful purpose." *In re City of Phila. Litig.*, 938 F.Supp. 1264, 1273 (E.D. Pa. 1996), *aff'd,* 158 F.3d 723 (3d Cir. 1998).

No reasonable juror could conclude that any Lancaster Defendant in this case meets the Act's willful misconduct exception. Willful misconduct is a higher and more culpable standard than deliberate indifference. *Compare Woloszyn*, 396 F.3d at 321 (To be liable on a deliberate indifference claim, a prison official must know (or should know) and *disregard* an excessive risk to inmate health or safety.) (emphasis added). While a person exhibits deliberate indifference by acting with disregard to a risk of constitutional violation, willful misconduct requires a person to act intending to commit a violation. Plaintiff's own legal authority, *Bornstad v. Honey Brook Township*, does not conflict with the Court's view. No. CIV.A. 03-3822, 2004 WL 1171244 (E.D. Pa. May 26, 2004). There, plaintiff alleged that police committed excessive force, assault, and battery in the course of an arrest that caused the suspect's death. *Id.* at *1. Setting aside that this opinion was issued on a motion to dismiss, not summary judgment, the Court held that the complaint alleged the officer—motivated by racial animus—willfully applied excessive force and committed assault and battery against the suspect. Here, Plaintiff has not established that any Lancaster Defendant intended any of the misconduct alleged.

24

Because none of the PrimeCare Defendants moved for summary judgment regarding this claim, Plaintiffs wrongful death and survival action claims will proceed against these Defendants.

## V.   CONCLUSION

Plaintiff has failed to produce sufficient evidence to support a genuine dispute of fact as to whether any Defendant other than Defendant Grimm is liable under § 1983 for Mr. Aichholz's tragic death, so the Court must grant those Defendants' motions for summary judgment in part. Plaintiff failed to produce sufficient evidence establishing that Defendants Klinger, Jones, or Snodderly knew or should have known of Mr. Aichholz's particular vulnerability for suicide. Plaintiff has also failed to produce sufficient evidence to support a genuine dispute of fact as to whether Defendants Cattell and Birriel's conduct could be causally connected to Mr. Aichholz's death. Plaintiff's evidence is also lacking with regard to its municipal liability claim against PrimeCare and Lancaster County.

Plaintiff has, however, produced evidence from which a reasonable juror could conclude that Defendant Grimm acted with deliberated indifference toward Mr. Aichholz's particular vulnerability to suicide. Accordingly, the Court must deny in part Defendant PrimeCare's motion for summary judgment.

In addition to the § 1983 claim against Defendant Grimm, much of Plaintiff's state law claims will also proceed to trial against the PrimeCare Defendants, although they are dismissed against the Lancaster Defendants because they are immune under the Act.[10] Since the PrimeCare motion for summary judgment did not contest the medical negligence claim against Defendant Grimm, that claim will proceed to trial. And none of the PrimeCare Defendants challenged Plaintiff's wrongful death and survival actions, so those too will proceed to trial. Therefore,

---

[10] The PrimeCare Defendants did not raise immunity under the Act as a defense.

because a § 1983 claim will proceed against Defendant Grimm that will involve substantially overlapping evidence and testimony as the state law claims proceeding to trial, and the Court will retain supplemental jurisdiction over Plaintiff's state law claims.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge